**In the Matter of an Application to Enforce an Administrative Subpoena of the COMMODITY FUTURES TRADING COMMISSION**

v.

**Naji Robert NAHAS, Appellant.**

**No. 83–2313.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 12, 1984.

Decided July 6, 1984.

Thomas W. Kelly, New York City, with whom Lawrence Z. Lorber, Washington, D.C., James D. Zirin, and Noah Nunberg, New York City, were on the brief, for appellant.

Howard Lowell Brown, Atty., Commodity Futures Trading Com'n, Washington, D.C., with whom Kenneth M. Raisler, Gen. Counsel, Commodity Futures Trading Com'n, Washington, D.C., was on the brief, for appellee.

Before WRIGHT, TAMM and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This appeal concerns a federal district court's jurisdiction under 7 U.S.C. § 15 (1982) to enforce an investigative subpoena served by the Commodity Futures Trading Commission (Commission) on a foreign citizen in a foreign nation. Naji Robert Nahas, a citizen and resident of Brazil, was served in Brazil with a subpoena *duces tecum* issued by the Commission. The subpoena required Nahas to appear and produce documents at the Commission's offices in Washington, D.C. Nahas did not comply with the subpoena, nor did he comply when the district court, exercising jurisdiction pursuant to 7 U.S.C. § 15, enforced the subpoena. The district court then froze *pendente lite* Nahas' assets in the United States and, after a full hearing, found Nahas in contempt for his failure to comply with the enforcement order. On appeal, Nahas contends that the enforcement order is void and that he should not be held in contempt for noncompliance with a void enforcement order.

Because we find that the district court lacks jurisdiction under 7 U.S.C. § 15 to enforce an investigative subpoena served on a foreign citizen in a foreign nation, the court's enforcement order, freeze order, and contempt order are void. Accordingly, we vacate all three orders.

## I. BACKGROUND

### A. *The Commission's Investigative Subpoena*

In March 1980, the Commission began investigating whether certain individuals had violated the Commodity Exchange Act (Act), 7 U.S.C. §§ 9, 13(b), 13b (1982), by manipulating the price of silver and silver futures contracts in 1979 and 1980. In the course of its investigation, the Commission discovered that Naji Robert Nahas, a Brazilian citizen and resident, had opened accounts in 1979 with several brokerage houses in the United States. Through these accounts, Nahas had purchased numerous silver futures contracts and approximately ten million ounces of silver bullion. Joint Appendix (J.A.) at 19, 183. Nahas also may have controlled accounts containing large quantities of silver maintained in the names of other individuals and entities. J.A. at 19–20, 103.

On May 6, 1983, the Commission issued a subpoena *duces tecum* pursuant to its investigative power under 7 U.S.C. § 15. The subpoena, served by substituted service in Sao Paulo, Brazil, directed Nahas to appear on July 12, 1983 at the Commission's offices in Washington, D.C. and to produce certain documents.[1] When Nahas failed to comply with the Commission's subpoena, the Commission petitioned the district court for an order directing Nahas to show cause why he should be relieved of compliance. J.A. at 10–11. The show cause order was issued on August 23, 1983 and served on Nahas in Sao Paulo. *CFTC v. Nahas*, No. 83–0256 (Order to Show Cause) (D.D.C. Aug. 23, 1983), J.A. at 8–9.

Nahas ignored the show cause order, prompting the court to issue an enforcement order directing Nahas to comply with the Commission's subpoena by October 6, 1983. *CFTC v. Nahas*, No. 83–0256 (Enforcement Order) (D.D.C. Sept. 14, 1983),

---

1. Prior to issuing the subpoena, the Commission consulted the United States Department of State concerning the proper method for serving an administrative subpoena on a Brazilian citizen in Brazil. The State Department advised that Brazilian law did not prohibit the service of an administrative subpoena by a Brazilian attorney upon a Brazilian citizen in Brazil. The State Department also provided the Commission with a list of Brazilian attorneys in Sao Paulo, where Nahas worked and resided, who could act as agents for the Commission in serving a subpoena. The Commission selected a Brazilian attorney from the list to serve the subpoena. Joint Appendix (J.A.) at 114–15, 145–46. The attorney delivered copies of the subpoena on June 14, 1983 to Nahas' office receptionist and to the doormen of Nahas' apartment building. J.A. at 40–41.

J.A. at 94.[2] Nahas failed to respond to the enforcement order. Upon the Commission's motion, the district court issued orders freezing *pendente lite* Nahas' assets in the United States[3] and directing Nahas to show cause why he should not be held in civil contempt. *CFTC v. Nahas*, No. 83-0256 (D.D.C. Oct. 11, 1983) (Order to Show Cause), J.A. at 142-43, (Order Freezing Assets), J.A. at 134-35.

## B.  *The Contempt Proceeding*

On November 14, 1983, Nahas formally responded for the first time in this proceeding. He filed a cross-motion to quash the Commission's subpoena, vacate the freeze order, deny the Commission's motion for contempt, and dismiss the proceedings in their entirety. J.A. at 162-63. Nahas contended that the Commission had exceeded its statutory authority in issuing an investigative subpoena to a foreign citizen in a foreign nation, and that the Commission's method of serving the subpoena was illegal.[4] J.A. at 189-94. In support of his contentions, Nahas submitted an affidavit prepared by Professor Irineu Strenger, a Brazilian attorney and a professor of law at the University of Sao Paulo, stating that the service of the Commission's subpoena violated Brazilian and international law. J.A. at 174-80. Nahas also submitted a document signed by thirty-five members of the Congress of Brazil protesting the administrative and judicial proceedings taken against Nahas as violative of Brazilian and international law. J.A. at 167-71.[5]

The district court rejected Nahas' arguments:

It is well established that a civil contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed. An order by a court with jurisdiction over the subject matter and the parties must be obeyed until reversed by orderly and proper proceedings.... It is clear, therefore, that if the September 14 [Enforcement] Order ... may be challenged at all in this contempt action, it may be challenged only on the grounds that the court lacked the power or jurisdiction to issue the order.

*CFTC v. Nahas*, 580 F.Supp. 245 at 247-248 (D.D.C.1983), J.A. at 220, 224-25 (citations omitted). The court found subject-matter jurisdiction under 7 U.S.C. § 15. *Id.* at 6-7, J.A. at 225-26. The court also found that Nahas' substantial participation in the futures markets of the United States constituted sufficient contacts for the court to exercise personal jurisdiction. *Id.* at 248, J.A. at 226-27. Concluding that it had competent jurisdiction to issue the enforcement order, the court held Nahas in contempt for disobeying the order without good cause.[6] *Id.* at 8, J.A. at 227.

**2.** The enforcement order was served on Nahas in Sao Paulo on September 28, 1983. J.A. at 116-17.

**3.** Nahas' assets in the United States consist of art valued at approximately 12 million dollars. J.A. at 187.

**4.** Nahas accompanied his cross-motion with an affidavit in which he averred he was a citizen of Brazil, had resided in Brazil since 1969, had never been a resident or citizen of the United States, had not conducted any business in the United States since May 6, 1983, and had not been personally served with the Commission's subpoena. J.A. at 166.

**5.** On March 2, 1984, the Brazilian Ministry of Foreign Affairs sent a letter to the United States Secretary of State protesting the method the United States had used to serve Nahas. The letter indicated that the United States improperly had circumvented Brazilian authorities, and it exhorted the United States to ensure future compliance with Brazilian law regarding the delivery of process communicating acts at the international level. *See* Letter from Brazilian Ministry of Foreign Affairs to United States Embassy (Mar. 2, 1984), Reply of Appellee to Appellant's Supplement of the Record, Exhibit 2. *See also* Letter from Brazilian Ministry of Foreign Affairs to Brazilian Ministry of Justice (Mar. 2, 1984), Appellant's Supplement of the Record.

**6.** To compel Nahas' compliance with the enforcement order, the court imposed a fine of $5,000 for each day after December 28, 1983 that Nahas failed to comply with the Commission's subpoena. If Nahas did not comply by January 6, 1984, the daily fine would increase to $10,000 and a bench warrant for Nahas' arrest would issue. Nahas also was ordered to reimburse the Commission for attorneys' fees and for costs incurred in the contempt proceeding. To preserve a fund from which any fines could

On appeal, Nahas challenges the district court's contempt and freeze orders on the ground that the enforcement order is void. Because we find that the district court lacked subject-matter jurisdiction under 7 U.S.C. § 15 to enforce an investigative subpoena served upon a foreign citizen in a foreign country, we agree that the enforcement order, freeze order, and contempt order are void.

## II. ANALYSIS

### A.

The Commission argues at the outset that Nahas may not challenge at the contempt proceeding the jurisdiction of the district court to issue the enforcement order. Because Nahas failed to pursue a timely appeal of the enforcement order, the Commission contends that the doctrine of *res judicata* bars Nahas from reopening an issue that could have been litigated during the enforcement proceeding. We disagree.

▪ The Commission's argument fails to acknowledge that the enforcement order against Nahas was entered by default. "A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). *See Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931). Because the instant enforcement proceeding resulted in a default order, Nahas was not barred by *res judicata* from challenging the court's enforcement jurisdiction at the contempt proceeding.[7] *See Insurance Corp. of Ireland*, 456 U.S. at 706, 102 S.Ct. at 2106; *United States v. Thompson*, 319 F.2d 665, 668 (2d Cir.1963); *Heasley v. United States*, 312 F.2d 641, 648–49 (8th Cir.1963); Restatement (Second) of Judgments § 65 (1982).

### B.

Nahas challenges the subject-matter jurisdiction of the district court to enforce the Commission's subpoena under 7 U.S.C. § 15. He contends that 7 U.S.C. § 15 does not empower a district court to enforce an administrative subpoena served on a foreign citizen in a foreign country. He claims the court therefore erred at the contempt proceeding in finding him in contempt and in imposing civil sanctions to compel his compliance.[8] We agree.

▪ It is a principle of first importance that a federal court possesses only

---

be satisfied, the court extended the freeze on Nahas' assets in the United States until Nahas purged himself of contempt. *CFTC v. Nahas,* 580 F.Supp. 245 at 249 (D.D.C. 1983), J.A. at 228–29.

7. Nahas' jurisdictional challenge at the contempt proceeding was also permissible under Rule 60(b) of the Federal Rules of Civil Procedure, which states in pertinent part:

On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: ... (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated ....

FED.R.CIV.P. 60(b). Under subsection 4 of Rule 60(b), a court may examine in a contempt proceeding whether the underlying enforcement order is void: if it is, relief from the enforcement order should be granted. Under subsection 5, if the underlying enforcement order is void, the

contempt order must also be void. *See V.T.A., Inc. v. Airco, Inc.,* 597 F.2d 220, 224 & n. 8 (10th Cir.1979); *Austin v. Smith,* 312 F.2d 337, 343 (D.C.Cir.1962).

8. 7 U.S.C. § 15 (1982) was the sole jurisdictional basis of the district court's enforcement order. *See* J.A. at 11, 94, 183–84, 225–26. Our analysis of whether the court exceeded its jurisdictional authority is therefore limited to this statute.

The Second Circuit's decision in *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041 (2d Cir.1983), is inapposite because it dealt with a private cause of action under the anti-fraud provisions of the Commodity Exchange Act. The Seventh Circuit's decision in *Tamari v. Bache & Co. (Lebanon) S.A.L.,* 729 F.2d 469 (7th Cir.1984), is similarly inapposite. For a discussion of the distinction between the service of notice that occurred in both *Psimenos* and *Tamari* and the service of compulsory process that occurred here, and of the consequences that flow from this distinction when other nations are involved, see *infra* note 14 and accompanying text.

limited jurisdiction.[9] *Insurance Corp. of Ireland,* 456 U.S. at 701, 102 S.Ct. at 2103. A federal court's subject-matter jurisdiction, constitutionally limited by article III, extends only so far as Congress provides by statute. *Id.* at 701–02, 102 S.Ct. at 2103–04; 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3522, at 44 (1975). When a federal court reaches beyond its statutory grant of subject-matter jurisdiction, its judgment is void.[10] Similarly, when an enforcement order entered by default is beyond the jurisdictional grant of the issuing court, the order is void. *See United States v. Thompson,* 319 F.2d 665, 668 (2d Cir.1963). *See generally EEOC v. Shell Oil Co.,* —— U.S. ——, ——, 104 S.Ct. 1621, 1628, 80 L.Ed.2d 41 (1984) (federal courts must observe congressional limits on agency investigative powers in enforcement of agency subpoenas).

In the instant case, the jurisdiction of the district court to enforce Commission subpoenas arises from 7 U.S.C. § 15:

> For the purpose of securing effective enforcement ... and for the purpose of any investigation or proceeding ..., any member of the Commission ... may ... subpena [sic] witnesses ... and require the production of any ... records that the Commission deems relevant ..... *The attendance of witnesses and the production of any such records may be required from any place in the United States or any State* at any designated place of hearing. In case of ... refusal to obey a subpena [sic] ..., the Commission may invoke the aid of any court of the United States within the jurisdiction in which the investigation or proceeding is conducted .... *Such court may issue an order requiring such person to appear before the Commission ...* to produce records ... or to give testimony .... Any failure to obey such order of the court may be punished by the court as a contempt thereof.

7 U.S.C. § 15 (emphasis added). The district court thus has jurisdiction to enforce only those subpoenas issued to "such person[s]" as defined in section 15. The plain language of the statute limits "such person[s]" to "witnesses ... from any place in the United States or any State ...." *Id.*

Although courts, in some instances, have construed similar language as authorizing enforcement of administrative subpoenas requiring the production of records from outside the United States, those subpoenas were served on individuals within the United States.[11] No court has expressly con-

---

**9.** A federal court presumptively lacks jurisdiction in a proceeding until a party demonstrates that jurisdiction exists. A party must therefore affirmatively allege in his pleadings the facts showing the existence of jurisdiction, and the court must scrupulously observe the precise jurisdictional limits prescribed by Congress. *See Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884); Fed.R.Civ.P. 8(a)(1), 12(h)(3); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3522, at 44–45 (1975).

**10.** In *Vallely v. Northern Fire & Marine Ins. Co.,* 254 U.S. 348, 41 S.Ct. 116, 65 L.Ed. 297 (1920), the Supreme Court stated:

> Courts are constituted by authority and they can not go beyond the power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities. They are not voidable, but simply void, and this even prior to reversal.

*Id.* at 353–54, 41 S.Ct. at 117. *See also Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104,

72 L.Ed.2d 492 (1982); *United States v. Walker,* 109 U.S. 258, 266–67, 3 S.Ct. 277, 282–83, 27 L.Ed. 927 (1883); Restatement (Second) of Judgments §§ 1, 11 (1982).

**11.** For example, in *SEC v. Minas de Artemisa,* 150 F.2d 215 (9th Cir.1945) (construing section 19(b) of the Securities Act of 1933, 15 U.S.C. § 77s(b)), the Ninth Circuit enforced an investigative subpoena that required a Mexican corporation, which was owned and controlled by a United States corporation and which did business in the United States, to produce records located in Mexico. The subpoena was *served within the United States upon a United States citizen* who was president of the Mexican corporation. *Id.* at 217. Similarly, in *FMC v. DeSmedt,* 366 F.2d 464 (2d Cir.) (construing section 27 of the Shipping Act of 1916, 46 U.S.C. § 826(a)), *cert. denied,* 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966), the Second Circuit enforced investigative subpoenas that required the production of documents located outside the United States in the possession of carriers who engaged in commerce in the United States. The

sidered whether Congress intended 7 U.S.C. § 15 to authorize judicial enforcement of an investigative subpoena served upon a foreign citizen in a foreign nation. Although the plain language of the statute does not confer such power, the district court in this case nevertheless inferred jurisdiction. Because this inference is not supported by legislative history or analogous precedent, we believe that sound rules of statutory construction compel a different conclusion.

■ An important canon of statutory construction teaches that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States . . . ." *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 285, 73 S.Ct. 252, 255, 97 L.Ed. 319 (1952); *United States v. Mitchell*, 553 F.2d 996, 1001–03 (5th Cir.1977). The text of 7 U.S.C. § 15 does not empower the Commission to serve subpoenas on foreign nationals in foreign countries. Similarly, the legislative history does not indicate that Congress intended to clothe the Commission with the power to serve investigative subpoenas extraterritorially. We are not prepared, in the face of a silent statute and an uninstructive legislative history, to infer the existence of this power:

> The service of an investigative subpoena on a foreign national in a foreign country . . . [is] a sufficiently significant act as to require that Congress should speak to it clearly.

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1327 (D.C.Cir. 1980) (McGowan, J., concurring).[12]

■ We are influenced as well by another canon of statutory construction that requires courts, wherever possible, to construe federal statutes to ensure their application will not violate international law.[13] *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 200 (1804); *Saint-Gobain*, 636 F.2d at 1323 & n. 130. To construe 7 U.S.C. § 15 as empowering the district court to enforce an investigative subpoena served on a foreign citizen in a foreign nation would seriously impinge on principles of international law. "When compulsory process is served [on a foreign citizen on foreign soil in the form

---

subpoenas were *served within the United States upon United States residents* who were agents of the carriers. 366 F.2d at 471. These cases indicate that the Commission would, under similar circumstances, have authority to require production of documents held abroad. *See CAB v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 953 (D.C.Cir.1979).

**12.** The Commission asserts that the court may infer from the language of section 15 that Congress intended the Commission to have power to serve its subpoenas extraterritorially. The statute authorizes the Commission to subpoena witnesses and records from "any place in the United States *or any State* . . . ." 7 U.S.C. § 15 (emphasis added). In support of its assertion, the Commission invites our attention to 7 U.S.C. § 3, which discusses transactions in interstate commerce and defines "State" as including foreign nations.

The Commission ignores, however, that 7 U.S.C. § 3 explicitly limits its definition of "State" to that section. We could as well be influenced by section 13a–2, which discusses the jurisdiction of states and defines "State" as "any State of the United States, the District of Colum-

bia, the Commonwealth of Puerto Rico, or any territory or possession of the United States." 7 U.S.C. § 13a–2(6).

Nevertheless, absent clear evidence of legislative intent, we are unwilling to extend to 7 U.S.C. § 15 definitions intended exclusively for other sections. Instead, we are guided by established rules of statutory construction, and we presume that had Congress intended to authorize the Commission to serve subpoenas on foreign citizens in foreign nations, it would unambiguously have expressed that intent.

**13.** The Constitution commits to the Legislative and Executive Branches, not to the Judicial Branch, the conduct of foreign relations. *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918). Our rules of statutory construction in the instant case embody concerns for preserving the relationships between the branches of government in a system of separation of powers. Hence, we hesitate to infer from 7 U.S.C. § 15, absent clear congressional intent, enforcement jurisdiction that arouses foreign sensibilities and implicates international law concerns.

of an investigative subpoena[14]], ... the act of service *itself* constitutes an exercise of one nation's sovereignty within the territory of another sovereign. Such an exercise [absent consent by the foreign nation] constitutes a violation of international law." *Id.* at 1313 (footnote omitted). *See also id.* at 1313–14, 1317; Restatement (Second) of the Foreign Relations Law of the United States §§ 7, 8, 32 & comment b, 44 (1965).

The extent of the intrusion on Brazil's sovereignty in this case is reflected in a letter of protest sent by the Brazilian government to the United States Secretary of State. Brazilian law requires that service of process by foreign nations be made pursuant to a letter rogatory or a letter of request transmitted through diplomatic channels. *See* Reply of Appellee to Appellant's Supplement of the Record, Exhibit 3. In its letter of protest, Brazil remonstrated that the Commission's method of serving the subpoena "[did] not conform to the [Brazilian laws] governing the handling of ... material [at the international level] ...."[15] Letter from Brazilian Ministry of Foreign Affairs to United States Embassy (Mar. 2, 1984), Reply of Appellee to Appellant's Supplement of the Record, Exhibit 2. Brazil therefore admonished the United States to "ensure compliance, in future cases, with the formalities prescribed by Brazilian law for the execution of legal instruments required by foreign courts." *Id. See supra* note 5.[16] In light of this

---

**14.** The distinction between service of compulsory process and service of notice is critical under principles of international law due to the difference in judicial enforcement power that accompanies each. When process in the form of a complaint is served extraterritorially, the informational nature of the process renders the act of service relatively benign in terms of infringement on the foreign nation's sovereignty. *FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson,* 636 F.2d 1300, 1313 (D.C.Cir.1980). *See supra* note 8. For example, when an agency serves a formal complaint on a foreign citizen in a foreign nation, the recipient simply receives information upon which he may decide whether to negotiate a consent order or proceed to litigation. The result of the litigation may always be appealed before a cease-and-desist order will issue. Not until the cease-and-desist order becomes final can the enforcement power of the courts be invoked.

By contrast, when an agency serves compulsory process in the form of an investigative subpoena, it compels the recipient to act. Should the recipient refuse to comply with the subpoena, the enforcement power of the federal courts can be invoked immediately. *See Saint-Gobain,* 636 F.2d at 1311–13. In the instant case, service of the Commission's subpoena on Nahas in Brazil constituted an act of American sovereignty within Brazil, because the subpoena carried with it the full array of American judicial power. *See id.* at 1312, 1313 & n. 67. Such an intrusion on the sovereignty of another nation impinges on principles of international law and should be avoided unless expressly mandated by Congress.

**15.** Not only did the Commission fail to observe Brazilian law when serving the subpoena, it ignored guidance by this court in *Saint-Gobain* concerning methods of extraterritorial service

that would minimize intrusion on another nation's sovereignty:

> [W]herever possible, an agency attempting subpoena service on foreign citizens residing on foreign soil should make initial resort through established diplomatic channels or procedures authorized by international convention.

636 F.2d at 1323. In *Saint-Gobain,* this court discussed the significant international implications of an agency bypassing foreign authorities when serving an investigative subpoena abroad:

> Given the compulsory nature of a subpoena, ... *subpoena service by direct mail upon a foreign citizen on foreign soil, without warning to the officials of the local state and without initial request for or prior resort to established channels of international judicial assistance, is perhaps maximally intrusive.* Not only does it represent a deliberate bypassing of the official authorities of the local state, it allows the full range of judicial sanctions for noncompliance with an agency subpoena to be triggered merely by a foreign citizen's unwillingness to comply with directives contained in an ordinary registered letter.

*Id.* at 1313–14 (footnotes omitted) (emphasis added). In the instant case, notwithstanding the Commission's inquiries to the State Department regarding how to serve the subpoena on Nahas, *see supra* note 1, the Commission's circumvention of Brazilian authorities appears to have been at least as intrusive and offensive to Brazilian sovereignty as was the agency's action in *Saint-Gobain.*

**16.** The intrusion on Brazil's sovereignty is also indicated by a letter from 35 members of the Brazilian Chamber of Deputies, a House in Brazil's bicameral legislature, to the United States Ambassador in Brazil protesting

apparently significant intrusion on Brazilian sovereignty, inferring enforcement jurisdiction under 7 U.S.C. § 15 would seriously impact on principles of international law. Because "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains," *The Schooner Charming Betsy,* 6 U.S. (2 Cranch) at 118, we are unwilling to infer enforcement jurisdiction absent a clearer indication of congressional intent.

We emphasize that this case does not pose a question about the authority of Congress; rather, it poses a question about the congressional intent embodied in 7 U.S.C. § 15. Federal courts must give effect to a valid, unambiguous congressional mandate, even if such effect would conflict with another nation's laws or violate international law. *Saint-Gobain,* 636 F.2d at 1323. A clear congressional mandate authorizing the Commission to serve investigative subpoenas on foreign citizens in foreign nations is lacking in 7 U.S.C. § 15, and inferring such a mandate would run contrary to established canons of statutory construction. In short, construing enforcement jurisdiction in the instant case would be, we believe, tantamount to enacting, rather than explicating, a law.[17]

### C.

Finally, our conclusion that Congress did not intend in 7 U.S.C. § 15 to empower federal courts to enforce investigative subpoenas served on foreign citizens in foreign nations comports with analogous cases in which courts have construed similar language. For example, in *SEC v. Minas de Artemisa, S.A.,* 150 F.2d 215 (9th Cir.1945), the agency was statutorily authorized to subpoena witnesses and documents "from any place in the United States or any Territory ...." *Id.* at 218. The Ninth Circuit construed the agency's authority broadly to require the production of documents outside the United States, *provided only that the service of the subpoena is made within the territorial limits of the United States." Id.* (emphasis added). In *Ludlow Corp. v. DeSmedt,* 249 F.Supp. 496 (S.D.N.Y.), *aff'd sub nom. FMC v. DeSmedt,* 366 F.2d 464 (2d Cir.), *cert. denied,* 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966), the agency was authorized to subpoena documents "from any place in the United States ...." 249 F.Supp. at 498 n. 2. The court there also construed broadly the agency's power to require the production of documents located outside the country, but it was careful to acknowledge *"that the service of the subpoena [was] made within the territorial limits of the United States ...." Id.* at 500 (emphasis added); *see id.* at 501. Finally, in *SEC v. Zanganeh,* 470 F.Supp. 1307 (D.D.C.1978), the agency was authorized to subpoena witnesses "from any place in the United States or any State ...." *Id.* The court stated that where no individual service occurred and respondent was not in the United States, *"the [agency] has no power to subpoena an alien nonresident to appear before it from a foreign land." Id.* (emphasis added).

[t]he proceedings against a citizen not subject to territorial competence (jus loci) of American Justice .... [The proceedings] affect personal and family honor of persons foreign to the Sovereignty and Competence of the Government of the United States.... We are certain that Your Excellency, due to the international and national importance which the fact represents, will transmit to the honorable authorities of your Country this manifestation and protest.

J.A. at 170–71.

17. The Commission correctly asserts that agencies generally are granted broad deference in determining the scope of their investigative authority. *CAB v. Deutsche Lufthansa Aktiengesellschaft,* 591 F.2d 951, 952 (D.C.Cir.1979). Because the Commission has construed its jurisdiction under the Act as extending to all market participants regardless of nationality or location, it contends that any ambiguity in 7 U.S.C. § 15 should be resolved in favor of promoting its investigative and regulative powers. The Commission fails to recognize, however, that judicial deference to an agency's interpretation of its investigative authority is not justified when the agency's action may have extraterritorial impact. *Saint-Gobain,* 636 F.2d at 1322. In light of the actual extraterritorial impact here and the absence of evidence indicating Congress intended to confer enforcement jurisdiction, we reject the Commission's argument and suggest that the argument more properly is directed to Congress. *See supra* note 13.

Our construction of 7 U.S.C. § 15 is further strengthened by the existence of statutes in which Congress explicitly has authorized the extraterritorial service of investigative subpoenas on aliens. For example, Congress has authorized the Department of Justice in its antitrust investigations to serve civil investigative demands on foreign nationals "in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign country." [18] 15 U.S.C. § 1312(d)(2) (1982). Congress also has empowered the Federal Trade Commission to serve its subpoenas on foreign nationals "in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign nation." *Id.* § 57b–1(c)(6)(B). The existence of these statutes "indicates that when Congress intends to authorize extraterritorial service of investigative subpoenas, it will express that intent explicitly." *Saint-Gobain,* 636 F.2d at .1325 n. 140. An explicit grant of power is conspicuously absent from 7 U.S.C. § 15.

Sound rules of statutory construction as well as analogous precedent therefore compel a construction of 7 U.S.C. § 15 that does not authorize enforcement jurisdiction in the instant case.[19]

CONCLUSION

For the foregoing reasons, we find that the district court lacked jurisdiction under 7 U.S.C. § 15 to enforce the investigative subpoena served on Nahas in Brazil. The enforcement order, freeze order, and contempt order are therefore void. Accordingly, all three orders are vacated.

*It is so ordered.*

---

**18.** Federal Rule 4(i)(1) provides five alternative methods for service upon a party in a foreign country: in the manner prescribed by the law of the foreign country; as directed by the foreign authority responding to a letter rogatory; by personal service; by any form of mail requiring a signed receipt; or as directed by order of the court where the action is brought. FED.R.CIV.P. 4(i)(1).

**19.** This court in *Saint-Gobain* resolved a narrow issue involving the *technique* employed by an agency to serve its investigative subpoena abroad pursuant to a statute similar to 7 U.S.C. § 15. Specifically, the court found that the Federal Trade Commission could not serve its subpoena on a foreign citizen on foreign soil by

registered mail under 15 U.S.C. § 49 (1976). 636 F.2d at 1306. Although it was unnecessary in *Saint-Gobain* to decide whether the statute conferred enforcement jurisdiction for investigative subpoenas served abroad on foreign citizens, the court's opinion seemed to assume the existence of such jurisdiction. We expressly address this jurisdictional issue today, and we hold that 7 U.S.C. § 15 does not confer enforcement jurisdiction for an investigative subpoena served on a foreign citizen in a foreign nation. This holding has been considered and approved by the full court, and thus constitutes the law of the circuit. *See Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981).