**AMERICAN LITHOTRIPSY SOCIETY and Urology Society of America, Plaintiff,**

v.

**Tommy G. THOMPSON, Defendant.**

**No. 01–CV–1812.**

United States District Court, District of Columbia.

July 12, 2002.

Gordon Alan Coffee, Winston & Strawn, Washington, DC, for Plaintiff.

Mark E. Nagle, U.S. Attorney's Office, Sonia M. Orfield, U.S. Department of Health and Human Services, Sonia M. Orfield, U.S. Department of Health and Human Services, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiffs American Lithotripsy Society ("ALS") and Urology Society of America ("USA") bring this action against defendant Centers for Medicare and Medicaid Services ("CMMS") contending that two regulations promulgated by defendant are unlawful as they apply to a medical procedure known as lithotripsy. Plaintiffs contend that the regulations violate the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), and the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* ("RFA"). The first regulation classifies lithotripsy as an "inpatient [or] outpatient hospital service," one of ten "designated health services" as to which physician referrals to entities with which the physicians have a financial relationship are statutorily prohibited. *See* 66 Fed.Reg. 856 (Jan. 4, 2001). The second regulation concerns the valuation methods defendant uses to determine "fair market value" for lithotripsy services.

Before the court are the parties' cross motions for summary judgment. Upon consideration of the motions and the opposition thereto, the court concludes that plaintiffs' motion must be granted with respect to their challenge under the APA to the classification of lithotripsy as an "inpatient [or] outpatient hospital service." This ruling renders plaintiffs' other claims moot.

## I. FACTUAL BACKGROUND

### A. Lithotripsy

Lithotripsy is a medical procedure performed by urologists that removes kidney stones through the use of a machine called a lithotriptor. A lithotriptor generates shock waves that break urinary tract stones into small pieces so that they may pass through the urinary tract and out of the body.

Prior to the advent of lithotripsy in the 1980's, treatment of urinary tract stones required invasive surgery followed by a week long hospitalization and up to two months of home recovery. In contrast, lithotripsy may be performed without hospitalization and requires only one or two days of home recovery. Thus, although a large initial investment is required to purchase a lithotriptor, lithotripsy is a less costly procedure overall than traditional surgery. Plaintiffs allege, however, that this cost savings made hospitals reluctant to invest in lithotripsy, because lithotripsy would generate less revenue than traditional surgery. As a result of this recalcitrance by hospitals, plaintiffs assert, lithotripsy remained unavailable to many patients.

Urologists desiring to provide lithotripsy to their patients acted to fill this void by purchasing lithotriptors. Because such an investment would not be cost-effective for a single urologist, urologists formed groups that collectively purchased or leased lithotriptors, or established lithotripsy centers to do so. The urologists who own the centers provide lithotripsy services to their own patients at the centers, and the centers also provide services to other urologists who need access to lithotriptors to treat their patients. More than half of lithotriptors are now owned by urologists.

## B. Regulation of Lithotripsy

### 1. "Under Arrangement"

CMMS requires that lithotripsy services provided to patients insured by Medicare be billed "under arrangement" with a hos-pital in order for providers to receive reimbursement from Medicare for the technical fees associated with the procedure. This means that urologists and lithotripsy centers cannot bill Medicare directly for lithotripsy technical fees but instead must enter into an arrangement with a hospital in order to be reimbursed. Under this arrangement the lithotripsy center typically provides all of the equipment and personnel to perform the procedure, including the lithotriptor itself, while the role of the hospital is limited to billing Medicare. By virtue of this billing role mandated by the "under arrangement" requirement, the hospital receives a large portion—up to 70%—of the Medicare technical fees for the lithotripsy services provided by the center, even though the lithotripsy center performs almost all of the work in delivering the services to patients.

Plaintiffs contend that because the hospital does not do more than bill Medicare for lithotripsy services provided by lithotripsy centers, the "under arrangement" requirement is not medically necessary.[1] Plaintiffs argue that both Congress and defendant recognized this in 1990 when, in an effort to reduce Medicare expenditures, they designated lithotripsy as one of the procedures that could be performed in an ambulatory surgery center ("ASC") without hospital involvement. Under such a regime, lithotripsy centers could bill Medicare directly and thereby avoid the "under arrangement" requirement and the concomitant fee-splitting with hospitals. However, because defendant has yet to finalize new rates for lithotripsy performed at ASCs after this court ruled its original rate-setting to be improper in 1992,[2] litho-

---

1. Although technically speaking defendant requires hospitals to provide oversight of lithotripsy procedures performed "under arrangement," defendant does not contest that in actuality hospitals do little more than billing. Nor does defendant contest that it reimburses

hospitals even when the lithotripsy is performed in mobile units outside the hospital and the patient never sets foot in the hospital.

2. *See Am. Lithotripsy Soc. v. Sullivan,* 785 F.Supp. 1034, 1036–37 (D.D.C.1992). After

tripsy centers remain unable to receive compensation under Medicare for lithotripsy performed at an ASC. Thus, in order to receive any Medicare compensation for lithotripsy, the centers must still be "under arrangement" with a hospital.

### 2. Stark Statutes

In 1989, Congress enacted legislation designed to address the strain placed on the Medicare Trust fund by the overutilization of certain medical services by physicians who, for their own financial gain rather than their patients' medical need, referred patients to entities in which the physicians held a financial interest. The legislation, Section 6204 of the Omnibus Budget Reconciliation Act (Pub.L.101–239), known as "Stark I" after its sponsor Congressman Fortney "Pete" Stark, reflected Congress' concern that such a financial interest "can affect a physician's decision about what medical care to furnish a patient and who should furnish the care." 63 Fed.Reg. 1659, 1660 (Jan. 9, 1998).

Stark I was modeled upon a Florida statute that prohibited all physician self-referrals, but created an exception for lithotripsy. See FLA. STAT. § 455.236. Lithotripsy was excepted from the Florida statute because a comprehensive study of physician self-referral commissioned by the Florida legislature concluded that physician ownership of lithotripsy centers did not pose a risk of overutilization. Like the Florida statute, Stark I was originally crafted as a blanket prohibition on physician self-referral, with specific exceptions for medical procedures not prone to overutilization. Among the exceptions was lithotripsy. See H. Rep. No. 101–247, 101st Cong. 1041 (1989) (including an exception for "a facility providing lithotripsy services for services performed personally by the referring physician"). In committee, however, the bill's scope was narrowed until in its final form it prohibited physician self-referrals only with respect to clinical laboratory services.[3] See 42 U.S.C. 1395nn. Since lithotripsy is not a clinical laboratory service, the exception for lithotripsy previously in the bill became unnecessary and was removed.

Four years later, Congress enacted Section 13562 of the Omnibus Budget Reconciliation Act of 1993 (Pub.L.103–66), known as Stark II, which expanded the reach of Stark I to prohibit physician self-referrals in eleven "designated health services" in addition to clinical laboratory services. The eleven designated health services are:

> physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; radiation therapy services and supplies; durable med-

---

adding lithotripsy to the list of services that could be performed at ASCs in 1990, defendant proposed a rate of $812 per lithotripsy procedure. When plaintiff ALS complained that this rate was $1600 too low, defendant raised it by $338. See Fed.Reg. 67666 (Dec. 31, 1991). ALS then filed suit in this court in 1992 alleging that defendant failed to explain its methodology for setting the rate. This court agreed and remanded the notice of the rate. A year later, defendant issued a new rate that was $150 less than the challenged one. When ALS provided comments and a study indicating that this rate was below the actual cost of lithotripsy, defendant deferred implementing the rate. Defendant proposed a third new rate of $2107 in June, 1998, but has not yet finalized this rate.

3. Clinical laboratory services are particularly prone to overutilization because they are usually used solely for diagnosis, when the extent and kinds of treatment a patient will require are inherently uncertain. It is easy for an unscrupulous physician seeking financial gain to order a slew of tests from an entity in which he has a financial interest, and difficult to show that such tests were not medically necessary at the time they were ordered.

ical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; and inpatient and outpatient health services.

*See* 42 U.S.C. § 1395nn(h)(6) ("Section 1395nn(h)(6)"). Lithotripsy was not explicitly included among the eleven services enumerated in Section 1395nn(h)(6), and none of the enumerated services were further defined in Stark II. In a colloquy during the floor debate in the House of Representatives regarding Section 1395nn(h)(6), Congressman Rose posed the following question to Congressmen Stark, the bill's sponsor and chairman of the committee responsible for the bill:

> I ask the chairman ... this question ... the physician self-referral ban enumerates 'inpatient and outpatient hospital services.' It is my understanding that this provision is not intended to apply to physician owned lithotripsy facilities that furnish services under contract with a hospital. Is this correct?

139 Cong. Rec. H6239 (Aug. 5, 1993). Congressman Stark responded, "[T]he gentleman is correct." *Id.*

On January 4, 2001, seven years after the passage of Stark II, CMMS issued final regulations implementing Stark II. *See* 66 Fed.Reg. 856 (Jan. 4, 2001). In these regulations CMMS announced that "inpatient and outpatient hospital services," the eleventh designated health service enumerated in Stark II, encompassed lithotripsy. *See id.* at 953–55. Thus, physicians are prohibited under the regulations from referring patients for lithotripsy services to entities with which they have a "financial arrangement" unless they meet one of the statutory exceptions. 42 U.S.C. § 1395nn(a) ("Section 1395nn(a)"). CMMS considers the "under arrangement" relationship it requires urologists to enter into

with hospitals in order to receive Medicare compensation to be a "financial arrangement" for purposes of the regulations. Thus, urologists cannot refer their Medicare patients for lithotripsy services, even if those services are to be personally provided by the referring urologist, unless they meet one of the exceptions to Section 1395nn(a).

The second provision of the regulations plaintiffs challenge deals with the threshold requirement that must be met before a party can qualify for any of the statutory exceptions to Section 1395nn(a). In order for a physician to be eligible for an exception that would permit referrals of patients to entities in which the physician has a financial interest, Stark II mandates that the physician cannot receive remuneration that exceeds "fair market value" for the services performed. 42 U.S.C. § 1395nn(a). Thus, if a hospital with an "under arrangement" relationship with a urologist pays the urologist "fair market value" for the urologist's lithotripsy services, the urologist may refer patients to the hospital (in effect, the lithotripsy center) for such services without incurring penalties under Stark II. Payment exceeding fair market value is in effect deemed payment for referrals.

"Fair market value" is defined in the statute as "the value in arms length transactions consistent with general market value ...." 42 U.S.C. § 1395nn(h)(3). In the preamble to the section of the 2001 regulations addressing this part of the statute, defendant stated that

> to establish the fair market value (and general market value) of a transaction that involves compensation paid for assets or services, we intend to accept any method that is commercially reasonable and provides us with evidence that the compensation is comparable to what is ordinarily paid for an item or service in

the location at issue, by parties in arms-length transactions, who are not in a position to refer to one another.

66 Fed Reg. at 944. In the section of the preamble specifically addressed to lithotripsy, however, defendant announced that

> because of the prevalence of physician ownership of lithotriptors may distort pricing in the marketplace, we believe valuation methods that look to the prices charged by persons not in a position to refer to the hospital or that consider acquisition cost and rate of return are especially appropriate.

*Id.* at 941. The regulation does not further define these valuation methods, and defendant has not rendered advisory opinions on the subject or specified how it will calculate "rate of return" for purposes of determining fair market value. Plaintiffs contend that defendant's use of these valuation methods exceeds the authority granted to it under the Stark II statute and is not a reasonable interpretation of the statute.

## II. ANALYSIS

### A. Federal Question Jurisdiction

Defendant first contends that this court lacks subject matter jurisdiction over plaintiffs' claims. Plaintiffs invoke federal question jurisdiction under the APA and RFA.[4] Defendants argue that federal question jurisdiction is barred by 42 U.S.C. § 405(h) ("Section 405(h)")[5], which provides that "[n]o action against the [CMMS Secretary] or any officer or employee thereof shall be brought under section 1331 ... of title 28 to recover on any claim arising under this subchapter." *Id.* Citing

the Supreme Court's decision in *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000), defendant argues that Section 405(h) requires that all claims "arising under" the Medicare statute be "channeled" through the designated administrative review scheme before a party may obtain judicial review, and that therefore plaintiffs cannot be heard in federal court until sanctions have been imposed by the agency.

Defendant overstates the Court's holding in *Illinois Council*. In that case, the plaintiff, a trade association of nursing homes, brought a pre-enforcement challenge under the APA to CMMS's health and safety regulations for nursing homes, alleging federal question jurisdiction under 42 U.S.C. § 1331. *See id.* at 5, 120 S.Ct. 1084. The plaintiff argued that the challenged regulations denied review "in practice" because they required a nursing home found to be deficient to submit a corrective plan and threatened termination of the nursing home from the Medicare system if it did *not* submit a plan, but imposed no further sanction or opportunity for review if the plan *was* submitted. *Id.* at 21, 120 S.Ct. 1084. Because its members could not afford to risk sanctions, plaintiff argued that they would always submit the required plans, thus losing their opportunity to contest the regulations. *See id.* at 22, 120 S.Ct. 1084.

The Court began its jurisdictional analysis by establishing that its previous decision in *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) should be read as holding that 405(h) does *not*

---

**4.** Plaintiffs concede that the Medicare statute itself does not provide jurisdiction in this case because it permits federal court review only after assessment of a civil money penalty or other sanction under Stark II, and defendant has not taken such action against plaintiffs.

42 U.S.C. § 1395nn(g)(3) and (4), § 1320a–7a; 42 C.F.R. § 1003.109–1003.27.

**5.** Section 405(h) was incorporated into the Medicare statute by 42 U.S.C. § 1395ii.

apply where it "would not simply channel review through the agency, but would mean no review at all." *Illinois Council*, 529 U.S. at 19, 120 S.Ct. 1084. Examining the record before it in light of this rule, the Court gave significant weight to the Secretary's statement that the plaintiff could "test the lawfulness of [the] regulations simply by refusing to submit a plan and incurring a minor penalty" short of termination, and noted that the plaintiff had not provided any "reason to doubt the Secretary's description of the agency's general practice." *Id.* at 22, 120 S.Ct. 1084. The court also emphasized that although the plaintiff trade association itself could not take advantage of the agency review channels, its individual members could. *See id.* at 24, 120 S.Ct. 1084. Because these facts persuaded the court that review was not foreclosed in practice by the regulations, the court explicitly declined to reach the question of whether "a general agency practice that forced [the plaintiff] to abandon legitimate challenges to agency regulations could amount to the 'practical equivalent of a total denial of judicial review.'" *Id.* at 22, 120 S.Ct. 1084 (quoting *McNary v. Haitian Refugee Center*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991)).

■ Under *Illinois Council*, then, the relevant question is whether applying 405(h) in the instant case would have the practical effect of denying plaintiffs judicial review. Plaintiffs argue persuasively that it would, particularly in light of the factors identified in *Illinois Council* as probative: the severity of the penalty incurred by a violation and the ability of plaintiffs' members to access administrative review. In contrast to *Illinois Council*, defendant here has not contested plaintiffs' assertions that if plaintiffs' members were to refer patients for lithotripsy in violation of defendant's regulations, they would be subject to statutory penalties of up to $15,000 per *bill* submitted to CMMS

and disgorgement of payments received from hospitals. *See* 42 U.S.C. § 1395nn(g)(3). Because a lithotripsy center typically performs hundreds of procedures annually, plaintiffs allege that these fines alone could subject a center to financial ruin. In addition, plaintiffs would be subject to criminal penalties and exclusion from participation in any federal health care program. *See* 18 U.S.C. § 287.

These penalties are far more serious than those before the Court in *Illinois Council* and can hardly be described as "minor." Indeed, in a recent pre-enforcement challenge by hospitals to another Medicare regulation, *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F.Supp.2d 33 (D.D.C.2000), a sister court from this district described sanctions almost identical to those threatened here— including termination from the Medicare program—as "draconian" and "'economic suicide,'" *id.* at 38, 39 n. 4. The court found that the case was therefore distinguishable from *Illinois Council*: "Unlike the nursing homes in *Illinois Council*, [p]laintiff's members, as a practical matter, do not have the option of incurring a minor penalty and receiving an administrative hearing before proceeding to federal court." *Psychiatric Health Systems*, 120 F.Supp.2d at 39. Because the plaintiff could not risk the severe sanctions in order to challenge the regulations, the *Psychiatric Health Systems* court held that judicial review was effectively foreclosed and that therefore Section 405(h) did not preclude the court from exercising federal question jurisdiction in accordance with *Bowen* and *Illinois Council*. *See id.* at 38–39, 120 S.Ct. 1084.

In *American Chiropractic Association v. Shalala*, 131 F.Supp.2d 174 (D.D.C. 2001), another post-*Illinois Council* challenge to Medicare regulations decided in this district, the court dismissed certain of

the plaintiffs' claims on the grounds that Section 405(h) barred federal question jurisdiction, but held that jurisdiction could be exercised as to the other claims because as a practical matter the regulations precluded judicial review of those claims. The *American Chiropractic* court distinguished *Illinois Council* as to the latter claims by looking to the second factor emphasized by the Supreme Court, the plaintiffs' access in real terms to administrative review channels. *See id.* at 177. The court found that the plaintiff chiropractors could only obtain administrative review by acting as the fiduciary of their patients, the Medicare enrollees. *See id.* The enrollees, however, would not have an incentive to pursue the chiropractors' interest in challenging the agency's regulation permitting non-chiropractors to provide a particular treatment to enrollees, because the enrollees' only concern would be in receiving the treatment, not in who provided it. *See id.*

This lack of representation in the agency review process presents an even bigger stumbling block to the plaintiffs in the present case, because enrollees will receive lithotripsy treatment from an urologist regardless of how the regulations divide lithotripsy technical fees between the urologist and the hospital. Thus, enrollees have no incentive to challenge the regulations. Moreover, in contrast to the plaintiffs in *Illinois Council* and in both of the D.C. district court cases, in this case the plaintiffs' members do not themselves have standing to challenge the regulations before the agency, because they are not considered "providers" under the Medicare statute. *See* 42 C.F.R. § 400.202. The hospitals with whom plaintiffs' members contract are considered "providers" under the statute, but they have even less of an interest in challenging the regulations than the enrollees, because they benefit from the fee arrangement currently in place.

This court finds the reasoning of its sister courts in analyzing the severity of the threatened sanctions and the plaintiff's access to review to be highly persuasive and in keeping with the Supreme Court's holdings in *Bowen* and *Illinois Council.* Because the defendant has not contested the plaintiffs' allegations of potential financial ruin and lack of either direct access or an adequate proxy in the administrative review process, we find that Section 405(h) does not bar federal question jurisdiction.

## B. Ripeness

Defendant next argues that even if the court finds that it has jurisdiction, the court should not reach plaintiffs' claims because they are not yet ripe for review. This argument is without merit.

The purpose of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the parties." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In determining whether a claim is ripe, the court applies a two-pronged test, evaluating 1) "the fitness of the issues for judicial decision," and 2) the "hardship to the parties of withholding court consideration." *Id.* As to the "fitness" prong, an issue is "fit" for decision if it is "purely legal in nature" and represents "final agency action." *National Mining Ass'n v. Slater,* 167 F.Supp.2d 265 (D.D.C.2001). An issue is "purely legal" if the agency's ability to exercise its authority does not "vary based upon the facts of the case." *Id.* at 265. As to the "hardship" prong, a claim is ripe if the " 'interest of those who seek relief from the challenged action's 'immediate and practical impact' upon them,' ... outweighs the competing institutional interest

in deferring review." *Askins v. District of Columbia,* 877 F.2d 94, 98 (D.C.Cir.1989). Where the fitness of the issues is established, however, " 'hardship' cannot tip the balance against judicial review." *Id.* at 98.

Defendant contends that its regulation classifying lithotripsy as an "inpatient [or] outpatient hospital service" under Stark II is not ripe for review because the relief sought by plaintiffs will not fully remedy the harm they allege. Defendant argues that because Stark II prohibits physicians from making self-referrals as to *any* designated health service, even if lithotripsy did not fall within a designated health service under the regulations and plaintiffs' members could thus refer their patients to hospitals with which they are "under arrangement" for lithotripsy, plaintiffs still could not refer patients to these hospitals for any other designated health service. Thus, defendant implies that plaintiffs' members will still suffer the harm they allege in the absence of the challenged regulation, only with respect to other designated health services rather than lithotripsy.

■ Assuming *arguendo* that this is true, the court does not see how it bears on plaintiffs' claims, which regard their members' ability to refer patients for *lithotripsy,* not other services. The court must therefore evaluate the effect of the challenged regulations, and the requested relief, on lithotripsy and lithotripsy only. Moreover, plaintiffs point out that many urologists contract with hospitals *only* with regard to lithotripsy and not any other services, and therefore the regulations do not effect any other referrals made by these urologists. As a result, for these urologists the relief sought would provide complete redress.

■ Defendant also argues that plaintiffs cannot demonstrate hardship because they do not suffer any real harm unless and until the agency imposes sanctions. This argument contradicts established precedent from this circuit and others holding that ripeness is not a bar to pre-enforcement review of regulations that are final and enforceable and which would cause substantial harm upon enforcement. *See, e.g., Chamber of Commerce v. Federal Election Comm'n,* 69 F.3d 600, 604 (D.C.Cir.1995) (stating that "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement"). The case cited by defendant in support of its position, *Florida Power & Light Co. v. EPA,* 145 F.3d 1414 (D.C.Cir.1998), does not hold to the contrary. In *Florida Power & Light,* the court held that a challenge to the *preamble* language in a *proposed* rule was not ripe because the rule was not final and because uncertainty remained as to "whether, or on what grounds, EPA would even apply this rule to [the plaintiffs]." *Id.* at 1421. In contrast, in the present case the classification of lithotripsy as an "inpatient [or] outpatient hospital service" is a final and enforceable rule that applies equally to all instances in which lithotripsy is provided to Medicare patients "under arrangement." Plaintiffs' challenge to this classification raises a purely legal question of statutory construction, and therefore no further development of the record is necessary. *See, e.g., Arizona v. Shalala,* 121 F.Supp.2d 40, 49 (D.D.C. 2000) (holding that where a case "raises a purely legal question, threshold suitability for judicial determination is assumed") (quoting *Eagle–Picher Indus. v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985)).[6]

---

**6.** Defendant also contends that plaintiffs' challenge to the regulation addressing "fair market value" fails on ripeness grounds. Because that challenge is rendered moot by our holding on plaintiffs' challenge to the regulation classifying lithotripsy as an "inpatient [or] outpatient hospital service," we need not reach this argument.

## C. APA

■ Plaintiffs argue that the regulations at issue violate the APA because they exceed defendant's statutory authority and are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A) & (C). When a party brings an APA challenge to an agency regulation interpreting a statute, judicial review is governed by the familiar two-step analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron*, a reviewing court must first determine whether Congress has "directly spoken to the precise question at issue." *Id.* at 842–43, 104 S.Ct. 2778. If Congress' intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* If the agency's interpretation of the statute is "contrary to clear congressional intent," the court must set aside the regulation. *See id.* at 843 n. 9, 104 S.Ct. 2778.[7] It is only where Congress' intent is ambiguous that the court reaches the second step of the analysis, the question of whether the regulation "is based on a permissible construction of the statute." *Id.* at 837–38, 104 S.Ct. 2778.

In determining whether Congress has directly spoken to the issue under the first step in the *Chevron* analysis, the court begins with the statutory language. *See id.* at 842, 104 S.Ct. 2778. If the statute's text is plain and unambiguous, " 'the sole function of the courts is to enforce it according to its terms.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal citations omitted). The plainness or ambiguity of statutory language "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Thus, a term in a statutory provision may "at first blush" appear to have a clear meaning, but that "initial impression... may not withstand scrutiny" when viewed in light of the provision's context. *Id.* (finding that although the term "employees" in an employment discrimination statute "would seem to refer to those having an existing employment relationship with the employer in question," its meaning in the larger statutory context was "ambiguous as to whether it excludes former employees"); *see also McCarthy v. Bronson*, 500 U.S. 136, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991) (relying on context of statutory phrase to reject the "most natural reading" of the phrase); *Crandon v. U.S.*, 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (stating that "[i]n determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy").

■ If analysis of the statutory language and its context does not yield a plain meaning, the court may look to the statute's overall purpose and its legislative history to discern Congress' intent. *See Robinson* at 341, 117 S.Ct. 843 (interpreting ambiguous statutory term in light of the statute's overall purpose); *Chevron*, 467 U.S. at 845–54, 104 S.Ct. 2778 (discussing at length the legislative history of the relevant statute after finding the statute's text an inadequate guide as to the meaning of the provision interpreted by the challenged regulations); *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (finding

---

7. The judiciary, not the agency, is the "final authority on issues of statutory construction." *Id.*

that "proper interpretation" of the statute at issue "cannot . . . ignore the larger context in which the entire statute was debated"); *Tataranowicz v. Sullivan,* 959 F.2d 268, 276 (D.C.Cir.1992) (finding that "congressional intent can be understood only in light of the context in which Congress enacted a statute and of the policies underlying its enactment").

If Congress' intent remains ambiguous after examination of the statute's legislative history and purpose, the court moves to the second step of *Chevron* and asks whether the agency's interpretation of the statute is a reasonable one. An agency rule is reasonable unless

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). While the court's scope of review is narrow, as it "is not empowered to substitute its judgment for that of the agency," the court should still conduct "a thorough, probing, in-depth review" of the agency's action. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). An agency rule must be supported by "substantial evidence" in the administrative record to withstand review. *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors,* 745 F.2d 677, 683–84 (D.C.Cir.1984).

Plaintiffs contend that defendant's classification of lithotripsy as an "inpatient [or] outpatient hospital service" contradicts congressional intent. Plaintiffs argue that when read together, the text, structure, purpose, and legislative history of the Stark II statute demonstrate a clear intent on the part of Congress *not* to include lithotripsy within the designated health services as to which physician self-referrals are prohibited. Defendant argues that the plain meaning of the statute's text requires that lithotripsy be *included,* and that therefore the court should not reach the legislative history. Defendant further argues that even if the court finds the statutory language ambiguous, the legislative history does not demonstrate clear congressional intent to exclude lithotripsy, and therefore the regulations should be upheld as reasonable under the second prong of *Chevron.*

### 1. Text

Defendant presents two arguments in support of its contention that lithotripsy falls within the plain meaning of "inpatient and outpatient hospital services." First, defendant argues that lithotripsy must fall within this category because it is only covered by Medicare when it is provided "under arrangement" with a hospital. Second, defendant asserts that the Medicare statute "further defines inpatient and outpatient hospital services in ways that require that they include lithotripsy." Def.'s Mot at 14. Neither of these arguments have merit.

Defendant's first argument attempts to proves too much by latching onto one word in the statutory phrase at issue, "hospital." The mere fact that urologists must have "under arrangement" contracts with *hospitals* in order to provide lithotripsy to Medicare patients does not convert lithotripsy into an "inpatient [or] outpatient *hospital* service" for purposes of Stark II. If it did, than any health service with a remote connection to a hospital would be an inpatient or outpatient hospital service. Moreover, defendant does not contest that the hospital's role in the "under arrangement" relationship is limited to serving as the billing agent for the treatment provided by the

urologist, treatment that often occurs without the patient stepping foot in the hospital. Indeed, it is ironic that defendant would make this argument when it is defendant who imposes the "under arrangement" requirement, even though defendant has previously acknowledged that the requirement is not medically necessary.

Defendant's second argument, that the Medicare statute "requires" that lithotripsy be classified as an "inpatient [or] outpatient hospital service," is likewise without merit. As an initial matter, Stark II does not contain any mention of lithotripsy, even though it mentions other very specific procedures for which self-referrals are banned, such as "magnetic resonance imaging" and "computerized axial tomography scans." 42 U.S.C. § 1395nn(h)(6). The phrase "inpatient and outpatient hospital services" appears only once in the statute, as one item on the list of eleven "designated health services." *See id.* Defense counsel conceded at the motions hearing that the phrase is not defined as such anywhere in Stark II, in its predecessor Stark I, or in the Medicare statute.

Thus, neither of the two sections of the Medicare statute upon which defendant bases its argument offers a direct parallel to the language in Stark II. The first section, 42 U.S.C. § 1395x(b)(3), defines "inpatient hospital services" as including "such other diagnostic or therapeutic items or services, furnished by the hospital or by others under arrangements with them made by the hospital, as are ordinarily furnished to inpatients either by such hospital or by others under such arrangement." The D.C. Circuit has interpreted this provision to encompass only those services associated with hospitalization, the costs of which "can be characterized as part of the hospital's expense in providing inpatient care." *College of Am. Pathologists v. Heckler*, 734 F.2d 859, 866–67 (D.C.Cir.1984); *see also Hultzman v. Weinberger*, 495 F.2d 1276, 1279–80 (3rd Cir.1974). Lithotripsy, however, is not a service associated with hospitalization. It is seldom performed inside a hospital, let alone on an inpatient basis.

Defendant claims that the second section of the Medicare statute it points to, 42 U.S.C. § 1395k(a), "effectively defines outpatient hospital services for the purposes of the [Medicare] program." Def.'s Mot. at 14. However, 1395k(a) defines "medical and other health services," not "outpatient hospital services." The fact that the definition includes "hospital services ... incident to physicians' services rendered to outpatients," 42 U.S.C. § 1395x(s)(2)(B), does not help defendant if the term being defined bears little resemblance to the term at issue. Moreover, it is by no means clear that lithotripsy would fall within 1395x(s)(2)(B).[8]

Because defendant has failed to establish that the plain meaning of "inpatient

---

8. The term "incident to" is itself a Medicare term of art defined by the Medicare regulations and Medicare manual. The applicable definition depends on whether the services "incident to" are hospital outpatient services or services furnished by a physician office or clinic: for the former, "incident to" services are those furnished by a hospital (or those under arrangement with a hospital) pursuant to a physician's order and under physician supervision, *see* Medicare Intermediary Manual 3112.4.A; for the latter, "incident to" services are those "rendered without charge or included in the physicians' bill," 42 C.F.R. § 410.26(a) (2000); Medicare Carriers Manual 2050 (CMS Pub. 14–3). Defendant argues that the applicable definition is the one for hospital outpatient services, and that lithotripsy meets this definition. Plaintiffs argue that the applicable definition is the one for a services furnished by a physician office or clinic, and that lithotripsy does *not* meet this definition, because it is a technical service that is billed separately from urologist's professional fees and is given a separate payment code by CMMS. Thus the parties' arguments regarding "incident to" simply reiterate their underlying positions regarding whether litho-

and outpatient hospital services" encompasses lithotripsy, we turn to the statute's purpose and legislative history.

### 2. Purpose and Legislative History

Plaintiffs argue that the legislative history of Stark II reveals Congress' clear intent *not* to include lithotripsy in the category of "inpatient and outpatient hospital services." Plaintiffs point to the colloquy on the House floor in which the bill's sponsor, Rep. Stark, confirmed in response to a question from another member that lithotripsy provided under arrangement with a hospital was not included in this category. *See* 139 Cong. Rec. H6238 (Aug. 5, 1993).

Defendant has not been able to identify any conflicting legislative history which might call into question the unequivocal assertion contained in this colloquy. Instead, defendant merely cites cases cautioning against giving great weight in statutory interpretation to statements made by members of Congress during floor debates. *See, e.g., Texas Mun. Power Agency v. EPA,* 89 F.3d 858, 874 (D.C.Cir.1996) (stating that "judges must 'exercise extreme caution before concluding that a statement made in floor debate … may be taken as statutory gospel,' in light of the 'endemic interplay, in Congress, of political and legislative consideration[s]' likely unrelated to the interpretive tasks of a court"), *Chemical Mfrs. Ass'n v. EPA,* 919 F.2d 158, 165 (D.C.Cir.1990) (stating with regards to a floor colloquy that the court "would be reluctant to give controlling weight to an isolated exchange of this type"). While this advice is well taken, courts' engaging in statutory interpretation regularly examine floor colloquies as one part of their analysis of the statute's overarching legislative history. *See e.g., Chevron,* 467 U.S. at 852 n. 25, 853, 104 S.Ct. 2778. Here, plaintiffs have cited oth-

er aspects of the legislative history that support the floor colloquy.

A complete grasp of the legislative history of Stark II cannot be obtained without connecting it to its predecessor, Stark I. As ultimately enacted, Stark I prohibited physician self-referrals only with respect to clinical laboratory services. *See* 42 U.S.C. § 1395nn. However, the bill had originally been crafted as a blanket prohibition on all such referrals, with a specific exception for lithotripsy. *See* H. Rep. No. 101–247, 101st Cong. 1041 (1989). The bill thus mirrored the Florida statute that it was explicitly modeled after and which also functioned as a blanket prohibition with a specific exception for lithotripsy, an exception based upon a study commissioned by the Florida legislature which showed no risk of overutilization of lithotripsy by physician self-referrals. *See* FLA. STAT. § 455.236. Thus, the exception for lithotripsy in the draft federal bill was consistent with the bill's purpose of discouraging overutilization of medical services. When the scope of the Stark I bill was narrowed in committee, there was no longer any need for the lithotripsy exception because lithotripsy is not a clinical laboratory service. Thus the exception was removed.

Plaintiffs argue that this background demonstrates that Congress has never regarded lithotripsy as part of the self-referral problem and therefore has consistently acted to exclude lithotripsy from its regulation of self-referrals. Defendant argues in response that the 1989 House Conference Report, which contained the original draft of Stark I with the exception for lithotripsy, shows that Congress "was plainly aware of how" to make an exception for lithotripsy, and that therefore the fact that Congress did not make such an exception in Stark II disproves that it intended that lithotripsy not be included in "inpatient and outpatient hospital ser-

---

tripsy should be regarded as a hospital or doctor-provided service.

vices." Defendant further contends that since the legislative history this argument relies upon is a Conference Report, it should be given greater weight than the colloquy cited by plaintiffs. *See U.S. v. Commonwealth Energy Sys. and Subsidiary Cos.*, 235 F.3d 11, 16 (1st Cir.2000) (stating that "[h]ere, where there is a Conference–Report, the district court's extensive reliance on the remarks of one member is misplaced").

Defendant's argument attempts to turn the legislative history on its head. Stark II, like Stark I, is structured not as a blanket prohibition but as a ban on referrals for specific kinds of services. Therefore, as with Stark I, Congress would not have felt a need to create a lithotripsy exception. The fact that Congress did not create such an express exception does not mean that Congress did not consider lithotripsy at all. When a new category-"inpatient and outpatient hospital services"-was added to the list of designated health services towards the end of legislative deliberations, members sought to ensure in the colloquy that it would not cover lithotripsy and thus would not violate their longstanding intent to keep lithotripsy out of self-referral regulation. Because the Conference Report and the colloquy are perfectly consistent under this interpretation, whereas defendant's argument would place them at odds, the Conference Report actually lends more support to plaintiffs' position.

The same rationale refutes defendant's argument that because the purpose of the statute is to reduce overutilization of medical services caused by self-referrals, Con-gress *ipso facto* must have intended it to prohibit self-referrals for lithotripsy. In fact, both the state of Florida and Congress have recognized that there is no such risk of overutilization with lithotripsy by excepting it from blanket prohibitions on self-referrals. The study commissioned by the Florida legislature found no such risk, and defendant has been unable to cite a study to the contrary. Indeed, CMMS recently acknowledged that lithotripsy is not susceptible to such abuse:

> Only when a patient requires surgical treatment would a physician prescribe [lithotripsy]. When a patient needs additional treatment, there is no alternative available that is less invasive or less expensive than [lithotripsy]. In addition, the procedure itself apparently documents the medical necessity to prescribe it ... [T]he kidney stone is located, identified, and the progress of the therapy is recorded as part of the visualization process ... [W]e agree that it might be unlikely that physicians would over-utilize [lithotripsy].

63 Fed.Reg. 1659, 1682 (Jan. 9, 1998).

Taken together, the lack of any mention of lithotripsy in the Stark II statute itself, the legislative history of the statute, and the statute's purpose demonstrate a clear intent on the part of Congress not to subject lithotripsy to the ban on self-referrals by including it in "inpatient and outpatient hospital services." Because of this clear evidence of Congressional intent, the court need not reach the second prong of the *Chevron* analysis and determine whether defendant's regulation was a reasonable interpretation of the statute.[9]

---

9. Plaintiffs also challenge the Stark II regulations setting forth the methods defendant will use in calculating "fair market value" for lithotripsy for purposes of determining whether a party qualifies for any of the statutory exceptions to 1395nn(h)(6) laid out in 1395nn(a). Because we have already determined that lithotripsy is not included within "inpatient and outpatient hospital services" under 1395nn(h)(6) and is therefore not subject to the statute's ban on self-referrals, plaintiffs no longer need to be concerned with whether they qualify for exceptions to the

### III. CONCLUSION

For the foregoing reasons, the court concludes that defendant's regulation classifying lithotripsy as an "inpatient [or] outpatient hospital service" under Stark II violates the APA and must be set aside. The court therefore grants plaintiffs' motion for summary judgment as to that issue, and denies defendant's motion for summary judgment. An appropriate order accompanies this memorandum.

### JUDGMENT

Pursuant to Fed.R.Civ.P. 58 and for the reasons stated by the court in its memorandum docketed this same day, it is this 12th day of July, 2002, hereby

**ORDERED** that defendant's regulation including lithotripsy within the designated health service "inpatient and outpatient hospital services" is invalid and of no force and effect; and it is further

**ORDERED** that defendant is permanently enjoined from implementing and enforcing said regulation.

ban. There is therefore no need for the court to reach this issue.

In addition, plaintiffs challenge defendant's regulations under the RFA, 5 U.S.C. § 601, which requires agencies to assess the impact of their regulations on small businesses. Because our holding on plaintiffs' APA claims provides plaintiffs will full relief, there is no need for the court to reach plaintiffs' RFA claims.